# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 20-1988V

| | |
|---|---|
| NANCY LEE MCCARN,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: June 6, 2025 |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On December 28, 2020, Nancy Lee McCarn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccination administered on November 12, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree on the amount of compensation.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the total amount of **$212,455.27**, comprised of $210,000.00 for actual pain and suffering, plus $2,455.27 for past unreimbursed medical expenses.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I.    **Relevant Procedural History**

Although Respondent conceded that Petitioner is entitled to compensation, the parties reached an impasse after attempting to resolve damages. *See* ECF No. 50. The parties simultaneously filed damages briefs on April 1, 2024. ECF No. 58-59. I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 29. That hearing was held on May 30, 2025,[3] and the case is now ripe for a written determination.

II.   **Relevant Facts**

Petitioner received a flu vaccine in her left arm on November 12, 2019. Ex. 1 at 37. At the time, she had a long history of chronic pain, including ankylosing spondylitis, knee replacement, multiple back surgeries, and osteoporosis – but no history of issues with her left shoulder. *Id.* at 8, 191. After her vaccination, Petitioner sought treatment for left knee pain, sacroiliac pain, and left leg pain, without mentioning shoulder pain. *Id.* at 212, Ex. 2 at 22.

On December 16, 2019 (34 days post-vaccination), Petitioner saw her primary care provider ("PCP") and complained of "pain located in the exact site of her left upper arm ever since she had the flu shot." Ex. 1 at 31. She was advised to use heat and Tylenol, and that her symptoms would resolve. *Id.* The doctor ordered an MRI of the left humerus at her next visit on January 21, 2020. *Id.* at 27. An ultrasound that day was normal. Ex. 5 at 17. The MRI revealed a possible supraspinatus tear with mild atrophy and recommended a dedicated shoulder MRI for further assessment. *Id*. at 15. A week later, a shoulder MRI confirmed a partial-thickness rotator cuff tear with tendinosis, bursitis, and osteoarthritis. *Id*. at 11-12.

On February 24, 2020, Petitioner saw her orthopedist to discuss the MRI results. Ex 2 at 49. She reported 9/10 pain and had reduced range of motion, reduced strength, and positive impingement signs. *Id.* The doctor suspected an axillary nerve injury and a secondary rotator cuff tendinitis. *Id*. at 53. He recommended a cortisone injection, which Petitioner declined. *Id.* She returned to her PCP the following day and was referred to a neurologist for evaluation and an EMG. Ex. 1 at 21.

On March 6, 2020, Petitioner was seen by a neurologist and was referred for an MRI of her brachial plexus and an EMG. Ex. 7 at 6. The MRI was normal. Ex. 5 at 8. She

---

[3] At the end of the hearing held on May 30, 2025, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

returned on March 27, 2020 with continued complaints of numbness in her fingers when she bent her elbow. Ex. 7 at 3. The doctor suspected the shoulder pain was orthopedic and the numbness was due to an ulnar neuropathy. *Id*. He referred Petitioner again for an EMG. *Id*.

On April 3, 2020, Petitioner saw a second neurologist for evaluation. Ex. 6 at 43. Petitioner stated that her pain had progressed, and was now affecting her entire left upper extremity. *Id*. at 45. That doctor doubted that Petitioner's symptoms were caused by a neurological cause, such as neuropathy, radiculopathy, or myopathy. *Id*. at 47. He ordered an EMG at Petitioner's request, but it yielded normal results. *Id*. at 45, 66.

Petitioner returned to her orthopedist on April 7, 2020, with 9/10 left shoulder pain. Ex. 2 at 67. She was diagnosed with a partial thickness rotator cuff tear. *Id*. A cortisone injection was recommended, which Petitioner again declined. *Id*. at 68. Petitioner was encouraged to start a home exercise program. *Id*. She saw her neurologist again on April 30, 2020. Ex. 6 at 101. The neurologist still did not find a cause for Petitioner's symptoms, but prescribed gabapentin "given that her pain is life altering." *Id*. at 105.  On June 11, 2020, Petitioner returned and reported that the gabapentin did not help her pain. *Id.* at 136. She was advised to follow up with orthopedics. *Id*. at 140.

On May 7, 2020, Petitioner saw a third neurologist for evaluation. Ex. 3 at 6. She complained of 8-9/10 pain. *Id*. She was diagnosed with osteoarthritis, a rotator cuff tear, and bursitis. *Id*. He referred Petitioner to physical therapy, encouraged her to start a home exercise program, and offered treatment with a TENS unit (which Petitioner declined). *Id*.

Petitioner began physical therapy on May 11, 2020. Ex. 6 at 15. She had eight sessions of PT through June 3, 2020, and made increases in range of motion and strength, but had minimal change in her pain levels. *Id*. at 21.

Petitioner also saw her orthopedist on May 11, 2020 – where she reported 8/10 pain radiating down her arm and up to her neck. Ex. 2 at 76. He again recommended a cortisone injection. *Id.* On June 16, 2020, Petitioner's orthopedist recommended surgery, which she underwent on July 31, 2020 (consisting of a left distal clavicle resection, subacromial decompression, left biceps tenodesis, and left rotator cuff repair. *Id.* at 87, 90, 95-96. Petitioner opted for an open procedure. *Id*. at 90.

Petitioner had 18 sessions of post-operative physical therapy between August 1 and September 29, 2020. Ex. 9 at 302-429. During her post-operative orthopedic appointments, Petitioner reported pain of 7/10 (August 13), 5/10 (September 10), and 4/10 (November 5). Ex. 2 at 91, 97, 118.

Petitioner returned to the neurologist on October 13, 2020 with complaints of worsening numbness and pain in her left arm. Ex. 29 at 7. She reported weakness and decreased grip strength – although those findings were not present on exam. *Id*.

Petitioner continued to seek neurological treatment for her left arm – seeing more neurologists in 2021. Ex. 11 at 4. On March 25, 2021, the differential diagnosis was either axillary nerve damage or complex regional pain syndrome ("CRPS"). Ex. 18 at 17. A second EMG on April 5, 2021 was "mildly abnormal" with evidence of mild median and ulnar sensory neuropathies. *Id*. at 19-20.

Petitioner returned to her orthopedist on May 11, 2021, reporting that her pain had gradually worsened to 8/10 after doing well after her first surgery. Ex. 26 at 19. She was diagnosed with CRPS and a rotator cuff tear. *Id*. The doctor again recommended an injection and ordered an MRI. *Id*. The repeat MRI revealed a "residual or recurrent" low-grade partial rotator cuff tear, a labral tear and fraying, findings associated with external impingement, a small reactive joint effusion with synovitis, and mild reactive bursitis. *Id.* at 17.

On May 20, 2021, Petitioner returned to her orthopedist with 8-9/10 pain. Ex. 26 at 13. She received a cortisone injection and was referred back to PT. *Id*. On June 14, 2021, Petitioner saw another orthopedist, who noted that the injection provided 24 hours of relief, but 9/10 pain and returned. Ex. 20 at 26. She received a second cortisone injection and was referred again to PT. *Id*. at 26, 30, 31.

Petitioner completed 12 more PT sessions between June 14 and August 10, 2021. Ex. 20 at 81-132. At the end of treatment, she rated her pain at 5-6/10. *Id*. at 81.

On August 11, 2021, Petitioner returned to her orthopedist with pain of 6-9/10. Ex. 20 at 19. She was scheduled for a second surgery on October 20, 2021, which consisted of left shoulder arthroscopy, supraspinatus repair, complete debridement, complete synovectomy, subacromial decompression with acromioplasty, distal clavicle excision, capsular release, and removal of a deep implant. *Id.* at 24, 59-61.

Two weeks after her second surgery, Petitioner rated her pain at 5-6/10 and was referred to physical therapy. Ex. 20 at 13, 17. Six weeks after surgery, her shoulder pain remained at 5-6/10 when controlled with THC gummies. Ex. 14 at 3.

She attended 25 physical therapy sessions between November 10, 2021 and February 28, 2021 Ex. 20 at 72; Ex. 24 at 30. At the end of this treatment, she rated her pain at 2-3/10. Ex. 25 at 32.

On March 3, 2022, almost six months after her second surgery, Petitioner reported 2-3/10 pain to her orthopedist. Ex. 25 at 3. She was instructed to continue her home exercise program and prescribed a Medrol Dosepak. *Id*. at 8.

Petitioner returned to her neurologist on July 27, 2022, with ongoing complaints of left arm pain. Ex. 30 at 9. She was diagnosed with axillary neuropathy on February 7, 2023. Ex. 32 at 13-14. She was prescribed a Quienza patch and advised to do physical therapy and acupuncture. *Id*. A third EMG was ordered, and it revealed the left axillary neuropathy. Ex. 32 at 18. On March 8, 2023, the axillary neuropathy was confirmed and Petitioner was referred for an MR neurogram and back to physical therapy. *Id*. at 9. She obtained additional treatment on March 20, 2023, and was referred for another MRI. Ex. 34 at 6. The third MRI revealed a high-grade supraspinatus re-tear that appeared chronic, a chronic labral tear, a small reactive GH joint effusion, and mild reactive bursitis. Ex. 33 at 11.

On April 19, 2023, Petitioner returned to the orthopedist with 7/10 left shoulder pain. Ex. 35 at 16. The orthopedist discussed the possibility of a third surgery and referred Petitioner back to physical therapy. *Id*. at 20. He recommended a repeat EMG before surgery. *Id*. Petitioner got a second opinion the same day. Ex. 36 at 10-12. She was told that she could "certainly live with the shoulder as-is" but that she could be a candidate for revision to reverse shoulder arthroplasty if her axillary neuropathy resolved. *Id*. at 12.

Petitioner had more physical therapy on May 10, 2023. Ex. 38 at 47. She completed 19 sessions of PT through November 14, 2023, with gaps during which she did her home exercise program while out of town caring for/visiting her son with terminal cancer. Ex. 38.

Affidavit Testimony

Petitioner provided an affidavit with her damages brief on April 1, 2024. Ex. 53. Petitioner states that she had pain immediately, discussed it with the nurse and her PCP, and was told it could take 6-8 weeks to resolve, so she waited to seek care. *Id*. at ¶2.

Petitioner stated that she and her husband have had a boat charter business since 2009. *Id.* at ¶10. Her husband captained the boats, and she worked the lines – anchoring and untying the boats – as well as cleaning and prepping for passengers. *Id.* She stated that they closed one side of the business in January 2020 due to her shoulder injury (and the expected 1-year recovery period). *Id.* at ¶11. They continued the remaining business, but she helped out only on calm waters to protect her shoulder. *Id.*

5

Petitioner states that she slept in a recliner prior to her first surgery and after her second surgery. Ex. 53 at ¶13, 24. She explained that she refused to take "heavy duty drugs" and used only Tylenol #3 and medical marijuana for pain relief. *Id*. at ¶14.

Petitioner described her difficulty in performing basic tasks due to her shoulder pain and surgery recovery as well as the emotional impacts, including being diagnosed with PTSD. *See e.g.*, Ex. 53 at ¶16, 20, 25, 26.

### III. The Parties' Arguments

Petitioner seeks an award of $235,000.00 for past pain and suffering, plus $1,500 per year for future pain and suffering. Pet. Br. at 1. In her brief and argument, Petitioner highlighted her high levels of pain, her two surgeries, including one open procedure, her multiple tests and imaging, and her numerous physical therapy treatments. *Id*. at 19-21. Petitioner also noted the long duration of her treatment and her ongoing symptoms with potential for future treatment. *Id.* Petitioner cited prior SIRVA cases that involved injured claimants with awards ranging from $199,000.00 to $210,000.00 in support of her requested damages. *Id.* at 17-18.

Petitioner also requested reimbursement for $6,495.83 in unreimbursed out-of-pocket expenses, and $328.34 in mileage reimbursement. Pet. Br. at 23. *See also* Ex. 39-51.

#### a. Respondent

Respondent proposes a pain and suffering award of $139,105.00 for past pain and suffering, with no future award. Res. Br. at 1. He characterizes Petitioner's SIRVA as "moderate to severe," with comorbidities that contributed to her pain and suffering at the same time as her SIRVA injury, including both orthopedic and neurological conditions. *Id.* at 10. Respondent also cited two prior SIRVA cases with awards between $135,000.00 to $185,000.00 to justify his proposed award. *Id*. at 10-11.

Respondent opposes Petitioner's request for an award for future pain and suffering. He argues that any future SIRVA treatment is "optional" and that Petitioner's "ongoing pain [is] most likely due to her axillary neuropathy," and not her SIRVA. Res. Br. at 12.

Respondent disputes certain of Petitioner's claimed out-of-pocket expenses and proposes an award of $895.00. Res. Br. at 13-14. Respondent argues that Petitioner should not be compensated for non-SRIVA treatment. *Id.* He further argues that

Petitioner's request for reimbursement for expenses for house cleaning, boat detailing, and lawn care are not appropriate under the Vaccine Act. *Id*.

## IV.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## V. Prior SIRVA Compensation Within SPU[5]

### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[6] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than

contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## V.  Prior SIRVA Compensation Within SPU[5]

### A.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[6] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than

written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *235* | *2,044* | *29* | *1,708* |
| **Lowest** | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| **Median** | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| **3rd Quartile** | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.  Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

---

instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a single-time future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI. Appropriate Compensation in this Case

a. Pain and Suffering

When determining the appropriate amount of compensation for a petitioner's pain and suffering, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

There is no dispute that Petitioner was aware of her injury, treatment, and experiences throughout the course of her injury. The records reflect that Petitioner

---

application of the statutory cap before any projected pain and suffering award is reduced to net present value).

suffered a moderate to severe SIRVA injury requiring significant treatment, including but not limited to two surgeries (one open, one arthroscopic), dozens of physical therapy treatments, and two cortisone injections over a period of approximately four years. She reported high levels of pain at the beginning of her treatment and moderate levels through most of her treatment (with the lowest reports being 2-3/10). Petitioner suffered from other conditions, including orthopedic problems in her back and left knee, and a simultaneous axillary neuropathy in her left arm, in addition to her SIRVA injury, which contributed to her pain and suffering. Finally, Petitioner continued to have SIRVA symptoms at the end of her treatment, and a third surgery was contemplated.

Both parties cited prior SIRVA cases in support of their proposed pain and suffering awards. In *Pruitt v. Sec'y of Health & Human Servs.*, 17-0757V, 2021 WL 5292022. *1-2 (Fed. Cl. Spec. Mstr. Oct. 29, 2021), the petitioner was awarded $185,000.00 in pain and suffering for a SIRVA injury that required two surgeries, three cortisone injections, and 14 physical therapy treatments over a four-year period (with a substantial treatment gap). That petitioner described severe pain immediately after the vaccination and was a working mother of two children during the course of her injury. *Id*. at *8-9. The claimant also described ongoing limitations, but she reported no pain at the end of her treatment and did not suffer any documented loss of arm function. *Id*. at 8. Although Respondent argues that Petitioner should be awarded less than the *Pruitt* petitioner, an analysis of the facts suggests otherwise. Ms. McCarn reported severe to moderate pain during much of her treatment course, had over 50 more physical therapy treatments (both before and after her surgeries), and had documented limitations at the end of her treatment – suggesting a higher award is appropriate.

*Schoonover v. Sec'y of Health & Human Servs.*, 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020), cited by Petitioner, also has value in determining the appropriate award in this case. The *Schoonover* petitioner endured treatment for two years, with two surgeries (both arthroscopic), two injections, and a significant number of physical therapy sessions. *See Schoonover v. Sec'y of Health & Human Servs.*, 16-1324V, 2019 WL 1040642, *2-4 (Fed. Cl. Spec. Mstr. Jan. 30, 2019). She was determined through an independent medical examination to have a 40% permanent partial shoulder disability. *Id.* at *4. At the time of her injury, Ms. Schoonover was a respiratory therapist, a position that was permanently impacted by her injury, and a mother to two sons. *Schoonover*, 2020 WL 5351341 at *1. She was awarded $200,000 in past pain and suffering and $1,200 per year for future pain and suffering. *Id*. at *6. Although Ms. McCarn did not have comparable employment impacts from her injury, she had an open surgery and a longer treatment course, justifying at least a similar award.

The records show that Petitioner continued to experience SIRVA symptoms at the end of her treatment and that there is evidence that she may seek future treatment.

However, Petitioner has not provided sufficient evidence for an award of future pain and suffering. Although further surgery has been discussed, the recommendation seems to be conditioned upon the prior resolution of Petitioner's left axillary neuropathy, rendering that likelihood somewhat speculative. *See* Ex. 36 at 12. Further, Petitioner points to a physical therapy record indicating a 57% disability -  but that assessment was completed by Petitioner and scored by the physical therapist, a substantial difference from the independent medical exam evidence that led to a future award in *Schoonover*. Pet. Br. at 22; Ex. 38 at 4. (I have, however, taken into account the evidence of ongoing symptoms and the potential for additional treatment in calculating the actual pain and suffering award).

Overall, considering the arguments presented by both parties in their briefs and at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$210,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

      b. <u>Unreimbursed Expenses</u>

Vaccine Program petitioners may be awarded reasonably necessary actual unreimbursable expenses that were incurred by or on behalf of the person who suffered a vaccine injury. Section 15(a)(1)(B). Although Petitioner requests $6,495.83 in unreimbursed expenses in her brief, her Exhibit 39 reflects a total $6,405.83. Pet. Br. at 23; Ex. 39 at 3. Petitioner's requested award includes expenses for medical copayments, prescriptions, lawn care, house painting, medical supplies, and house cleaning. *See* Ex. 39; Ex. 41. Petitioner also argues that her expenses for medical marijuana were necessary and prescribed by a pain management specialist. Pet. Br. at 23. Petitioner requests an additional $328.34 for reimbursement for mileage. *Id*.

Respondent argues that Petitioner should not be reimbursed for expenses, including mileage, related to non-SIRVA related medical treatment. Res. Br. at 13. Respondent further objects to certain of Petitioner's expenses are not ordered or recommended by physicians. *Id*. Finally, Respondent objects to Petitioner's claimed expenses for lawn care and house cleaning expenses as inappropriate under the Vaccine Act. *Id*.

I have reviewed the records filed by Petitioner. I find that her neurological treatment was unrelated to her SIRVA injury and therefore, those expenses, including mileage, will not be awarded. Further, Petitioner's expenses for lawn care, house painting, and house cleaning are not adequately supported by the record – in fact, there is no evidence that Petitioner, who was already disabled at the time of her SIRVA injury due to other conditions, performed those tasks prior to her injury. To establish this kind of out-of-the-ordinary expense, more substantiation is required.

Finally, pursuant to the Controlled Substances Act, marijuana and marijuana-containing compounds, mixtures, or preparations, are Schedule I substances. 21 U.S.C.A. § 812. Schedule I substances are defined as having "no currently accepted medical use in treatment in the United States." *Id*. Notwithstanding the fact that Petitioner appears to have obtained her treatment through a state-sanctioned prescription, her expenses for medical marijuana cannot be reimbursed through the Vaccine Act.

Accordingly, I award Petitioner a total of **$2,455.27,**[12] comprised of $2,193.63 in expenses plus $261.64 in mileage, as compensation for her past out-of-pocket expenses.

## Conclusion

In light of all of the above, I award **Petitioner a lump sum payment of $212,455.27, comprised of $210,000.00 for pain and suffering and $2,455.27 for past unreimbursed expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner, <u>Nancy Lee McCarn</u>.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[13]

---

[12]

| Expenses | | $6405.83 | Mileage | $328.34 |
|---|---|---|---|---|
| Jaffe Sports Med. | Ex. 3 at 6 | -100.00 | | |
| Neurology Spec. | Ex. 7 at 3-4, 6-7 | -20.00 | | |
| Florida Neuro. | Ex 2 at 105-06, 136; Ex. 6 at 45-47, 66 | -40.00 | | -5.10 |
| Dr. Rubino | Ex 11 at 4 | -10.00 | | -15.04 |
| USF Neuro | Ex. 18 at 10, 17-20; Ex. 30 at 9-12 | -30.00 | | -43.84 |
| Dr. Duan | | | | -2.72 |
| Walgreens | Ex. 50 | -21.00 | | |
| Lawn Care | Ex 46 | -2435.00 | | |
| Dr. Morris – medical marijuana | Ex. 42 | -594.00 | | |
| House cleaning | Ex. 41 at 28 | -250.00 | | |
| Misc. Exp (THC/CBD products) | Ex. 41 at 13, 17, 20, 23, 25-27 | -712.20 | | |
| | Totals | $2,193.63 | | $261.64 |

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
